# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| LAKE MICHIGAN BEACH | ) | Judge Timothy A. Barnes |
| POTTAWATTAMIE RESORT LLC , | ) | |
| | ) | Case No. 15-42427 |
| Debtor. | ) | Hearing: May 11, 2016 at 10:30 a.m. |

## <u>NOTICE OF MOTION</u>

TO:     SEE ATTACHED SERVICE LIST

On May 11, 2016 at 10:30 a.m., or as soon thereafter as counsel may be heard, I shall appear before the Honorable Timothy A. Barnes, or any judge sitting in his stead, in the courtroom usually occupied by him in Room 744 of the of the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, and shall then and there present **BCL-BRIDGE FUNDING LLC'S SECOND MOTION TO DISMISS CASE OR IN THE ALTERNATIVE FOR RELIEF FROM THE AUTOMATIC STAY** a copy of which is attached hereto and served upon you.

Respectfully submitted,

BCL-CAPITAL FUNDING LLC

By:     /s/ Marc I. Fenton
        One of its Attorneys

Marc I. Fenton, Esq. (ARDC 6180633)
Jamie L. Burns (IL ARDC 6300120)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602
312-346-8380
312-346-8434 (fax)
jfriedland@lplegal.com

LP 10519849.1 \ 37811-99198

CERTIFICATE OF SERVICE

I, Marc I. Fenton, hereby certify that I served the foregoing Notice and attached Motion, via ECF and regular mail, unless otherwise indicated, by filing and mailing same prior to 5:00 p.m. on May 9, 2016 from 2 N. LaSalle St., Chicago, Illinois 60602.

/s/ Marc I. Fenton

*(Via US Mail Only)*
Lake Michigan Beach Pottawattamie Resort LLC
103 E. Irving Park Road
Roselle, IL 60172

Miriam R. Stein
Francisco Connell
Chuhak & Tecson, P.C.
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
mstein@chuhak.com
fconnell@chuhak.com
*Attorneys for Debtors*

Patrick S Layng
Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604
USTPRegion11.ES.ECF@usdoj.gov

*(Via US Mail Only)*
Erica Friedman
c/o Dettman & Fette Law Office
249 Enterprise Way
Benton Harbor, MI 49022

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In Re: | ) Chapter 11 |
| | ) |
| **LAKE MICHIGAN BEACH** | ) |
| **POTTAWATTAMIE RESORT LLC,** | ) Judge Timothy A. Barnes |
| | ) |
| **Debtor.** | ) Case No. 15-42427 |
| | ) |

### BCL-BRIDGE FUNDING LLC's SECOND MOTION TO DISMISS CASE OR IN THE ALTERNATIVE FOR RELIEF FROM THE AUTOMATIC STAY

BCL-BRIDGE FUNDING LLC ("*BCL*"), the holder of the mortgage on the Debtor's only property (a non-operating vacation resort consisting of multiple units, hereinafter referred to as the "*Property*"), by and through its undersigned counsel, files this, its second motion to dismiss this bankruptcy case for cause, or, in the alternative, for relief from the automatic stay ("*Motion*"). In support thereof, BCL states as follows:

### I.    Executive Summary

1.    Debtor owns two parcels of real estate which make up the Property.

2.    Based upon the Debtor's petition, BCL is the largest creditor in the estate.

3.    Debtor first defaulted on its obligations to BCL in July of 2015; however, in August of 2015, BCL and the Debtor entered into a Forbearance Agreement ("**Forbearance Agreement**") pursuant to which, in exchange for certain promises and payments by Debtor, BCL agreed to forbear in its rights under the loan documents, hereinafter described, until October 21, 2015 ("*Forbearance Period*"). A copy of the Forbearance Agreement is attached hereto and made part hereof as **Exhibit "A"**.

4.      Upon expiration of the Forbearance Period, Debtor failed to pay the balance due BCL, which Debtor acknowledged in the Forbearance Agreement totaled $2,641,147.89 as of August 20, 2015. Debtor also acknowledged that default interest and deferred interest would continue to accrue during the Forbearance Period.

5.      After the Debtor's default, BCL published a notice of a non-judicial foreclosure sale of the Property in Berrien County, Michigan, where the Property is located.

6.      Debtor – who now owes BCL in excess of $3.5 million – filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code the day before the scheduled sale.

**II.      Factual Background**

7.      BCL is an Illinois limited liability company that acquires and originates high risk loans secured by real estate.

8.      On or about December 18, 2014, Debtor executed a Secured Draw Promissory Note in the principal amount of $500,000 ("***Note 1***") and a Secured Promissory Note in the original principal amount of $1,336,000 ("***Note 2***" and together with Note 1, the "***Notes***") in favor of BCL. True and correct copies of Note 1 and Note 2 are attached hereto and incorporated herein by reference as **Exhibits "B"** and **"C"**, respectively.

9.      The Notes are secured by the Property, along with properties located in Streamwood, Lemont, Bartlett and Roselle, Illinois (collectively "***Illinois Properties***").

10.     BCL has junior mortgages on the Illinois Properties, and the Debtor is not the mortgagor on any of the Illinois Properties.

11.     Debtor defaulted on the terms of Note 1 and Note 2. On or about August 21, 2015, Debtor entered into the Forbearance Agreement with BCL whereby it agreed to pay BCL the balances due under Note 1 and Note 2 on or before October 21, 2015 (see Exhibit A hereto).

2

12.     In the Forbearance Agreement, Debtor also acknowledged the balance due BCL as of August 20, 2015 totaled $2,641,147.89 and that default interest and deferred interest continued to accrue during the Forbearance Period. (Ex. A, ¶8; Ex. 2 thereof).

13.     Debtor failed to pay the balance due BCL upon expiration of the Forbearance Period. Thereafter, BCL began taking action to enforce its rights under the Notes and against the Property and Illinois Properties.

14.     On November 2, 2015, BCL filed a Complaint to Foreclose Mortgages on the Streamwood, Lemont and Bartlett Properties, which is presently pending under case number 2015 CH 16118 in the Circuit Court of Cook County, Illinois against the Debtor and others, including the mortgagors on the Streamwood, Lemont and Bartlett Properties, 560 Bartlett, Inc., Stephen Lemont LLC, Gary Danno and Rosie Danno, respectively.

15.     On November 3, 2015, BCL filed a Complaint to Foreclose Mortgage on the Roselle Property, which is presently pending under case number 2015 CH 1867 in the Circuit Court of DuPage County, Illinois against the Debtor and others, including the mortgagor on the Roselle Property, 103 Irving, Inc.

16.     Beginning on November 19, 2015 and continuing for three subsequent weeks thereafter, BCL published a Foreclosure Notice against the Property in the Berrien County Record, a newspaper circulated in Berrien County, Michigan, where the Property is located, for a non-judicial foreclosure sale scheduled to take place against the Property (for which the Debtor is the mortgagor) on December 17, 2015 at 11:00 a.m.   A true and correct copy of the Foreclosure Notice and Affidavit of Publication for the Foreclosure Notice is attached hereto as **Exhibit D**.

17.     On December 16, the evening prior to the foreclosure sale of the Property, Debtor filed its Chapter 11 case.

18.     Due to the bankruptcy filing and the triggering of the automatic stay, BCL was forced to adjourn the sale of the Property.

19.     BCL is currently owed in excess of $3.5 million by the Debtor.

20.     BCL's original Motion to Dismiss was denied by this Court in its Memorandum Decision and Order Denying Motion to Dismiss entered on April 5, 2016 [Dkt. No. 47].

21.     Throughout this Chapter 11 case, Debtor has repeatedly advised the Court that it will reorganize or refinance the debt owed BCL.  Despite the passage of almost five months since the Debtor filed this bankruptcy and despite numerous requests to see evidence of the refinance, Debtor has failed to produce an executed and enforceable commitment letter.  The Debtor does not have the financial wherewithal to refinance the debt or reorganize.  BCL has no confidence in the Debtor's ability to finalize economic terms with its prospective lender and requests that this Court dismiss the Chapter 11 case for cause, or in the alternative, terminate the automatic stay as to BCL.

**III.    Argument**

22.     Section 1112(b) of the Bankruptcy Code permits the Court to convert or dismiss a chapter 11 case for "cause," providing in relevant part:

> "(1) [O]n request of a party in interest and after and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interest of creditors of the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause ..." 11 U.S.C. § 1112(b)(1).

23.     The inclusion of the word "shall" was a change in the statute pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which

eliminated the vast discretion that the Court had previously been granted in making a conversion

determination prior to BAPCPA. See 7 Collier on Bankruptcy ¶ 112.04[1] at 1112-21 to 1112-22

(15th ed. rev.) (noting that "as amended in 2005, section 1112(b) circumscribes the court's

discretion by directing certain instances in which the court must, and must not, convert or

dismiss the case"). Therefore, absent the enumerated mitigating circumstances, upon a showing

of cause, the Court must convert or dismiss the Debtor's bankruptcy case.

24.     As the Supreme Court has noted, "a chief purpose of the bankruptcy laws is to

'secure a prompt and effectual administration and settlement of the estate of all bankrupts.' "

*Katchen v. Landy*, 382 U.S. 323, 328-29 (1966) (citations omitted). In order to avoid incurring

the costs associated with such administration in cases where such costs are not justified,

Congress enacted § 1112(b) to provide a court with a tool to eliminate the burden of such costs in

inappropriate chapter 11 cases at the earliest possible stage. See *In re Woodbrook Assocs.*, 19

F.3d 312, 317 (7th Cir. 1994).

25.     Thus, the threshold question for a court when ruling on a motion to convert or

dismiss a case pursuant to § 1112(b) is whether "cause" exists to grant such a motion. See 11

U.S.C. § 1112(b). Section 1112(b)(4) enumerates sixteen (16) examples of cause. However, this

list is not exhaustive, and the Court may convert or dismiss a case for reasons that are not

specifically enumerated. See *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) (noting

that the pre-BAPCPA statutory examples of cause are not exhaustive).

26.     Cause under Section 1112(b)(4)(J) includes, "failure to file a disclosure statement

or to file or confirm a plan within the time fixed by this title or by any order of the Court." The

Debtor's bankruptcy case, which was filed December 16, 2015, has languished in Chapter 11 for

nearly five (5) months with no progress and little direction. Debtor has never operated its business, either prior to the filing of this case, or during its Debtor-in-Possession period. Therefore, there is no history of operations and there are no projections for revenue or profit which can provide a basis for a plan or disclosure statement. It is impossible, therefore, for the Debtor to file and confirm a plan of reorganization based upon operations and projected income. The other alternatives available to the Debtor, in terms of a mechanism for reorganization, are either to sell the Property or refinance the debt. Debtor has repeatedly told this Court that it has received offers from entities willing to invest and refinance the debt owed BCL. Therefore, it appears that Debtor is relying upon a refinance as the basis for a plan of reorganization. In fact, the Court was recently presented with Debtors motion to extend the exclusivity period presumably so the Debtor could finalize its refinancing. In granting the motion, the order provided that a Plan and Disclosure Statement had to be on file by May 16, 2016 and that the exclusivity period would end that day as well. [Dkt. No. 55]. The Court scheduled this status hearing prior to the end of the exclusivity period so that the parties could advise the Court on the Debtor's efforts to refinance. BCL is of the opinion that based upon its limited conversations with the prospective lender; there is little chance that the obligations will be refinanced. BCL has never received a definitive commitment letter from the prospective lender despite its numerous requests. The inability to provide a written commitment to refinance the debt, the lack of operations, and the lack of income, foreclose several avenues as a basis for reorganization.

27.    Debtor may argue that it cannot provide a written loan commitment because BCL will not waive default interest or lower its pay-off. BCL was asked to reduce the amount it was owed, and in fact, provided Debtor's counsel with a reduced pay-off figure lowering the amount BCL would accept as a pay-off by approximately $250,000. Despite BCL's efforts and

willingness to voluntarily reduce the amount owed, the prospective lender has failed to finalize its commitment letter. Instead, the prospective lender has revised its position which it has done several times since refinancing negotiations began. BCL understands the current proposal will require that BCL retain an equity position in the Property and that one of Debtor's principals also provide additional cash, in the hundreds of thousands of dollars range, which this individual does not have and cannot afford. It is apparent that there is no agreement by the parties on the terms of refinancing. Debtor's inability to negotiate an agreement with the prospective lender forecloses an avenue to reorganize and to file and confirm a plan of reorganization.

28.    The Debtor has had more than sufficient time to negotiate a refinancing or to sell the Property. BCL originally made its loan to the Debtor in December 2014. The intent of the loan was to provide a bridge for the Debtor to obtain permanent financing. From December 2014 through today, the one constant has been the inability on behalf of management of the Debtor to convince a lender to refinance the obligation owed to BCL or to sell the Property. This history, dating back to December 2014, further evidences an inability to file and confirm a plan of reorganization based upon either a refinancing or sale of the Property. For these reasons, cause is shown and the Chapter 11 case should be dismissed.

29.    In the alternative, BCL requests that the automatic stay be modified to allow BCL to complete its foreclosure sale. Section 362(d) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating annulling…(1) for cause, including lack of adequate protection of an interest in property of such party in interest; (2) with respect to a stay of an act against property under subsection (a) of this section, if (A) the

debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization…" 11 U.S.C. Sections 362(d)(1) and (d)(2).

30.    Although the Debtor has made numerous statements to this Court through its pleadings as well as its Schedule of Assets and Liabilities regarding the value of the Property (see Dkt. No. 23, Schedule A/B, Part 9, Current Value of Debtor's interest in real property, $7,485,000.00), Debtor has not provided to BCL or this Court an appraisal which verifies the value it suggests.  Contrary to Debtor's assertions, Debtor's own broker, who listed the Property in November 2015 for $6,300,000, has continuously reduced the asking price.  As of February 25, 2016, Debtor's broker lists the Property for $3,240,000.  This figure represents a $3,000,000 reduction in price (see **Exhibit "E"**).  The Debtor has been unable to sell the Property since November 2015, even with numerous price reductions.  Therefore, there is no reason to believe the Debtor could sell the Property through a plan or a Section 363 sale which would be sufficient to provide proceeds to the estate in excess of BCL's debt.

31.    The fair market value of a property is the amount at which the property would change hands between a willing buyer and willing seller, when the former is not under any compulsion to buy, and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.  With the Property listed at $3,240,000, it begs credulity to think someone with knowledge of the facts would pay $7,485,000 for the Property, or $6,000,000 or even $4,000,000.  *Assuming, arguendo* the Property was to sell for the asking price, once a broker's commission and taxes are included, the proceeds to the estate will be less than the amount owed to BCL.  Based upon these figures, the estate does not have equity in the Property and the automatic stay should be modified to allow BCL to complete its foreclosure.

32.    BCL is not adequately protected.  The Debtor has listed the Property with a broker and has reduced the asking price by over $3,000,000 within three months of the listing. These facts certainly suggest that the Property is overvalued for the location and that the market for potential purchasers is limited.  Again, the Debtor has had since December 2014 when BCL made a bridge loan to negotiate a sale of the Property. There is no reason to believe the Debtor can sell the Property through a plan or through a Section 363 sale.  These facts suggest that the court should modify the automatic stay for cause and allow BCL to proceed with its foreclosure sale.

### IV. Conclusion

For all the reasons articulated herein, this Court can and should (a) dismiss this case for cause in accordance with section 1112(b) of the Bankruptcy Code; or in the alternative, (b) terminate the automatic stay pursuant to section 362(d) of the Bankruptcy Code as to BCL; and (c) waive the provision of Federal Rule of Bankruptcy Procedure 4001(a)(3) and have the lift stay order effective immediately; and (d)  for such other and further relief this Court deems just and proper.

Respectfully Submitted,
BCL-BRIDGE FUNDING LLC


By:   /s/ Marc I. Fenton
        One of Its Attorneys


Marc I. Fenton (ARDC 6180633)
Jamie L. Burns (ARDC 6300120)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street, Suite 1300
Chicago, Illinois 60602
(312) 346-8380
jburns@lplegal.com

# EXHIBIT A

# FORBEARANCE AGREEMENT

## FORBEARANCE AGREEMENT

This Forbearance Agreement ("Agreement") made effective as of August 21, 2015, by and among **LAKE MICHIGAN BEACH POTTAWATTAMIE RESORT, LLC**, a Michigan limited liability company ("Borrower"), **Michael E. Olsen** ("Olsen"), **Gary J. Danno** ("Danno"), **Timothy D. Finnander** ("Finnander"), and **Gerald A. Janicke** ("Janicke") (Olsen, Danno, Finnander and Janicke shall hereinafter be referred to individually and collectively as "Guarantor") and **BCL-BRIDGE FUNDING LLC** ("Lender") (Borrower, Lender, and Guarantor are sometimes referred to collectively herein as "the Parties").

### PREAMBLE:

Reference is made to the following:

A.   That certain Loan and Security Agreement dated as of December 18, 2014, by and between Borrower and the Lender (the "Loan Agreement"); and

B.   That certain Mortgage dated as of December 18, 2014, given by Borrower to the Lender, recorded on January 22, 2015 as Document No. Liber 3092, Page 2827 with the Berrien County, Michigan Recorder of Deeds (the "Pottawattamie Mortgage"), with respect to the Property; and

C.   That certain Mortgage dated as of December 18, 2014, given by Dootland, Inc. to the Lender, recorded on January 12, 2015 as Document No. Liber 3092, Page 0097 with the Berrien County, Michigan Recorder of Deeds (the "Dootland Mortgage") (the Pottawattamie Mortgage and Dootland Mortgage shall be referred to herein collectively as the "Mortgage"), with respect to Condominium Unit 10 at the the Property; and

D.   That certain Mortgage dated as of December 18, 2014 given by Danno to Lender with respect to Condominium Unit 7 at the Property (the "Danno Mortgage"); and

E.   That certain Mortgage (the "Lemont Mortgage") dated as of December 18, 2014, given by Stephen Lemont, LLC to Lender against the property at 212 Stephen, Lemont, Illinois (the "Lemont Property"); and

F.   That certain Mortgage dated as of December 18, 2014 given by Danno and Rosie Danno to Lender against the property at 113 West Railroad, Bartlett, Illinois (the "Railroad Mortgage"); and

G.   That certain Mortgage dated as of December 18, 2014 given by Bartlett, Inc. to Lender against the property at 560 Bartlett Road, Streamwood, Illinois (the "Bartlett Road Mortgage"); and

H.   That certain Assignment of Leases and Rents dated as of December 18, 2014 given by Borrower to the Lender, as recorded on January 22, 2015 in Liber 3092, Page 2827 with the Berrien County, Michigan Recorder of Deeds (the "Pottawattamie Assignment"); and

I.   That certain Continuing Unconditional Guaranty dated as of December 18, 2014 given by Olsen to the Lender (the "Olsen Guaranty"); and

J.  That certain Continuing Unconditional Guaranty dated as of December 18, 2014 given by Danno to the Lender (the "Danno Guaranty"); and

K.  That certain Continuing Unconditional Guaranty dated as of December 18, 2014 given by Finnander to the Lender (the "Finnander Guaranty"); and

L.  That certain Continuing Unconditional Guaranty dated as of December 18, 2014 given by Janicke to the Lender (the "Janicke Guaranty") (the Olsen Guaranty, Danno Guaranty, Finnander Guaranty and Janicke Guaranty shall be referred to herein collectively as the "Guaranty"); and

M.  That certain Securities Pledge Agreement dated as of December 18, 2014 given by Olsen to the Lender (the "Olsen Security Agreement"); and

N.  That certain Securities Pledge Agreement dated as of December 18, 2014 given by Danno to the Lender (the "Danno Security Agreement"); and

O.  That certain Securities Pledge Agreement dated as of December 18, 2014 given by Janicke to the Lender (the "Janicke Security Agreement"); and

P.  That certain Securities Pledge Agreement dated as of December 18, 2014 given by Finnander to the Lender (the "Finnander Security Agreement") (the Olsen Security Agreement, Danno Security Agreement, Janicke Security Agreecmnt and Finnander Security Agreement shall be referred to herein collectively as the "Security Agreement"); and

Q.  That certain Secured Promissory note dated as of December 18, 2014 in the original principal amount of $1,336,000.00, given by Borrower to the Lender (the "Note"); and

R.  That certain Secured Draw Promissory Note dated as of December 18, 2014 in the original principal amount of $500,000.00, given by Borrower to the Lender (the "Draw Note") (the Note and Draw Note shall be referred to herein collectively as the "Note").

Pursuant to the Documents (as defined below), Lender made certain financing available to Borrower. Borrower is in default under the Documents (the "Existing Default"). Borrower and Guarantor have each requested the Lender to forbear from exercising the Lender's rights, remedies and powers against Borrower and Guarantor as set forth in the Documents and under applicable law until the Forbearance Date (as defined below). The Lender has agreed to so immediately forbear against Borrower and Guarantor, in accordance with this Agreement, so long as, among other things, the Borrower and Guarantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the premises which are incorporated herein by this reference and constitute an integral part hereof, the execution and delivery of this Agreement and the mutual covenants and agreements hereinafter set forth, the Parties hereto agree as follows:

1.  All capitalized terms used in this Agreement shall have the same meaning as in the Documents, unless those terms are otherwise defined in this Agreement. As used in this Agreement, the following terms shall have the following meanings:

(a)  "Assignment of Rents" shall have the meaning set forth in the Preamble to this Agreement.

(b)    "Claims" shall have the meaning set forth in Section 13 of this Agreement.

(c)    "Deed" shall have the meaning set forth in Section 2(i)(E) of this Agreement.

(d)    "Documents" shall mean each of the documents referenced in the Preamble of this Agreement, together with all agreements, documents and instruments required or contemplated by those documents.

(e)    "Default" shall have the meaning set forth in Section 10 of this Agreement.

(f)    "Existing Default" shall have the meaning set forth in the Preamble to this Agreement.

(g)    "Forbearance Date" shall mean October 21, 2015.

(h)    "Guaranty" shall have the meaning set forth in the Preamble to this Agreement.

(i)    "Loan Agreement" shall have the meaning set forth in the Preamble to this Agreement.

(j)    "Liabilities" shall mean all liabilities, indebtedness and obligations of Borrower to the Lender, howsoever created, arising or evidenced, whether now existing or hereafter arising, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, primary or secondary, joint or several, whether existing or arising through discount, overdraft, purchase, direct loan, participation, operation of law, or otherwise, including, but not limited to, all liabilities, indebtedness and obligations of Borrower to the Lender pursuant to this Agreement, any letter of credit, any standby letter of credit or any of the Documents and reasonable outside attorneys' and paralegals' fees or charges relating to the preparation of this Agreement, the Documents and the enforcement of Lender's rights, remedies, powers and security interests under this Agreement and the Documents, including, but not limited to, the drafting of any documents in the preparation and enforcement of the loans evidenced by the Documents.

(k)    "Mortgage" shall have the meaning set forth in the Preamble to this Agreement.

(l)    "Net Proceeds" shall mean in the event of a refinance of the Property, the sum of (i) the gross refinance amount of the Property minus (ii) standard closing costs, commissions to Persons other than Borrower, and Borrower attorney's fees, all relating solely to the refinance of the Property, with the aggregate of all such deductions not to exceed 5% of the gross refinance amount of the Property.

(m)    "Note" shall have the meaning set forth in the Preamble to this Agreement.

(n)    "Person" shall mean individually, and "Persons" shall mean collectively, any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, federal, state, county, city, municipal or otherwise including, without limitation, any instrumentality, division, agency, body or department thereof).

(o)    "Property" shall mean the real estate subject to the Mortgage, which is more commonly known as the Lake Michigan Beach Pottawattamie Resort, located at 4766 Arbor Avenue, Coloma, MI together with certain condominiums located at the same address, together with lots 7 and 10 at the same address and all improvements located thereon.

(p) "Security Agreement" shall have the meaning set forth in the Preamble to this Agreement.

2. In order to induce the Lender to (A) immediately forbear from exercising the Lender's rights, powers and remedies against Borrower and Guarantor under the Documents and applicable law, and (B) enter into this Agreement,

(i) Borrower, Danno, and/or Olsen (as applicable) shall:

(A) Contemporaneously herewith, Borrower shall make a payment of $21,163.00 to be applied by the Lender to the Note in such order in Lender's sole discretion;

(B) Commencing on August 31, 2015 and continuing on the Monday of each week thereafter, Borrower shall submit a report to the Lender detailing its efforts to refinance the Note with outside lenders and any other information which the Lender requests with respect to the Borrower's business;

(C) At all times during the term of this Agreement, Borrower shall use best efforts to refinance the Note with a third party lender;

(D) On the Forbearance Date Borrower shall pay the Lender all amounts due and owing under the Documents.

(E) Contemporaneously with the execution and delivery of this Agreement, execute and deliver to the Lender a Deed in Lieu of Foreclosure Agreement relating to the Property (including Lot 7 and Lot 10) in form and substance acceptable to Lender (a copy of the draft agreement is attached hereto as Exhibit 1) under which a deed or deeds to the Property (together, the "Deed") and other documents are deposited with the Lender. The Deed may only be recorded by the Lender upon the occurrence of the first to occur of (1) a Default; or (2) the Forbearance Date; provided, however, that (1) the Deed shall be void if the Lender is paid in full on or before the Forbearance Date; and (2) the Lender shall have sole discretion to determine if the Lender shall actually accept and record the Deed and (3) the Lender shall have no obligation to accept or record the Deed; and

(F) In addition to any agreements, documents and instruments described above, execute and deliver or cause to be executed and delivered to the Lender such other agreements, documents and instruments required by and in form and manner satisfactory to the Lender; and

(ii) Guarantor shall:

(A) Provide the Lender with copies of all written agreements, documents, instruments and communications relating to any proposed sale of the Property; and

(B) In addition to any agreements, documents and instruments described above, execute and deliver or cause to be executed and delivered to the Lender such other agreements, documents and instruments required by and in form and manner satisfactory to the Lender.

(iii)     Until the Liabilities are paid in full, Borrower shall turn over to the Lender 100% of the Net Proceeds of any refinance.

(iv)     Borrower shall not transfer, assign, pledge or mortgage any property of Borrower, except in favor of the Lender.

(v)     Notwithstanding anything else contained in the Documents, Borrower and Guarantor acknowledge and agree that the Lender shall have no obligation to provide any loans or advances to Borrower, make any financing available to Borrower, or re-loan any portion of the principal amount of the Note that has been paid or will at any time in the future be paid to the Lender by Borrower, Guarantor or any other Person.

(vi)     On the Forbearance Date, in the event the Lender does not exercise its rights under the Deed in Lieu of Foreclosure Agreement, Borrower and/or Guarantor shall pay the Lender all of the then unpaid Liabilities.

(vii)     Contemporaneously herewith, Borrower shall amend its operating agreement and cause Stephen Lemont, LLC to amend its operating agreement to provide that a bankruptcy or any other litigation may not be commenced without the vote of a special member, which special member shall be appointed by Lender.

(viii)     Contemporaneously herewith, Borrower shall cause to be executed by Stephen Lemont LLC, a mortgage in favor of Lender and against the property at 212 Stephen Street, Lemont, Illinois, which mortgage shall be recorded by Lender after the concurrent refinance on that property has closed.

(ix)     Contemporaneously herewith, Borrower and Guarantor shall cause all membership interests in Stephen Lemont LLC and the ownership interests in 560 Bartlett, Inc. to be pledged to Lender as security for the Liabilities and all obligations hereunder.

(x)     Borrower and Guarantor all acknowledge and agree that (i) any right or equity of redemption with respect to the Property is hereby waived, (ii) in light of the Existing Default, the forbearance contained herein is adequate consideration received by Borrower and Guarantor for this waiver, (iii) Borrower and Guarantor are not in any way being forced to provide this waiver and no fraud or undue influence has been exerted by Lender on Borrower or Guarantor in making this waiver.

3.     So long as (A) no Default has occurred; and (B) the Borrower and Guarantor (i) each timely complies with all of their covenants and agreements contained in this Agreement and, (ii) each executes and delivers to the Lender, all of the agreements, instruments, and documents required to be delivered by each of them pursuant to this Agreement, and (iii) makes each of the payments required to be made to the Lender pursuant to this Agreement and the Documents, the Lender agrees to (a) forbear from taking any further action against the Borrower and Guarantor with respect to the Existing Default for a period through and including the Forbearance Date and (b) contemporaneous with the receipt of the payment required in 2(i)(A) above, provide a release of the Lemont Mortgage (Borrower understands and agrees that a new mortgage will be filed against the Lemont Property shortly after the release is recorded); provided, however, that the Lender's agreement to so forbear shall have no force and effect and shall be deemed immediately null and void if either (I) any Default occurs and/or Borrower or Guarantor fail to comply with or meet any of the requirements of clauses 3(i) through (iii) above; or (II) the Lender is required to return any monies received at any time or from time to time by the Lender from any Person with respect to the Liabilities due and owing the Lender by the Borrower; or (III) any bankruptcy or receivership proceeding is filed by or against Borrower or Guarantor; or (IV) except with the Lender's prior written consent, Borrower or any Guarantor makes an assignment for the benefit of creditors; provided, further, that the Lender may take any

and all actions it deems reasonably necessary to protect its rights, remedies and powers with respect to Borrower and Guarantor, the Documents and applicable law against any action or proceeding taken by any third party not a party to this Agreement.

4.    Borrower and Guarantor each expressly acknowledge and agree that (A) the forbearance described in Paragraph 3 of this Agreement constitutes good and valuable consideration to each of the Borrower and Guarantor in exchange for Borrower's and Guarantor's various covenants and agreements set forth in this Agreement; and (B) Borrower and Guarantor have been represented and advised by counsel in connection with the execution and delivery of this Agreement and that such attorney has explained the terms and provisions of this Agreement to each of the Borrower and Guarantor; and (C) the Lender's agreement to forbear pursuant to this Agreement terminates after the earlier of (i) the occurrence of a Default; or (ii) the Forbearance Date; and (D) unless Borrower pays the Lender in full all of the Liabilities, immediately upon the earlier of (i) the occurrence of a Default; or (ii) the Forbearance Date, the Lender shall then have the ability to exercise all of its rights, remedies and powers pursuant to the Documents and this Agreement; and (E) no agreement or covenant of the Lender described in this Agreement shall have any further force and effect after the earlier of (i) the occurrence of a Default; or (ii) the Forbearance Date.

5.    All of the pledges, assignments, transfers, conveyances, mortgages and grants of security interest of any property given to the Lender by each of the Borrower and/or Guarantor pursuant to the Documents or any other agreement, instrument or document related to or contemplated by the Documents, shall and hereinafter do continue to constitute pledges, assignments, transfers, conveyances, mortgages and grants of security interest of property to secure all of the Liabilities, whether now existing or hereinafter arising, including, but not limited to, pursuant to the Documents, this Agreement, all agreements, documents and instruments contemplated or required pursuant to this Agreement and/or any of the other Documents.

6.    All the representations and warranties made by the Borrower and Guarantor to the Lender in the Documents are hereby restated to the Lender and all of such representations and warranties remain true and correct as of the date of this Agreement. Borrower and Guarantor hereby (A) reaffirm and restate all of the covenants and agreements made by each of them in the Documents; and (B) reaffirm the validity and enforceability of each of the Documents; and (C) acknowledge, agree and confirm that this Agreement and the Documents executed by them are legal, valid, enforceable and binding upon each of them.

7.    Guarantor hereby reaffirms and restates all of the agreements, representations, covenants and obligations as set forth in the Guaranty and the Security Agreement. Guarantor shall continue to guaranty pursuant to the terms of the Guaranty and this Agreement, all of the Liabilities and all of the indebtedness, obligations and liabilities of Borrower under the Documents and this Agreement. Guarantor acknowledges, confirms and agrees that each Guaranty constitutes an unconditional guaranty of the Liabilities.

8.    Borrower and Guarantor each represent, warrant, acknowledge, agree and confirm that through August 20, 2015 the amounts listed on Exhibit "2", plus legal fees accurately reflect indebtedness of Borrower due and owing to the Lender.

9.    Borrower and Guarantor each agree to do such further acts and things and to execute and deliver to the Lender such additional assignments, agreements, powers, documents and instruments as the Lender may reasonably require or deem advisable to carry into effect the purposes of this Agreement, or to confirm onto the Lender its rights, powers and remedies under this Agreement, including, but not limited to, executing and delivering such amendments and/or restatements of the Documents required by the Lender and any additional pledge agreements or mortgages required by the Lender. Borrower shall perform any and all acts requested by the Lender to establish, maintain and continue any security interest and liens given

to the Lender, including but not limited to, executing or authenticating financing statements and such other instruments and documents when and as reasonably requested by the Lender. Borrower hereby authorizes the Lender through any of the Lender's employees, agents or attorneys to file any and all financing statements, including, without limitation, any continuations, transfers or amendments thereof required to perfect the Lender's security interest and liens in personal property under the applicable Uniform Commercial Code in effect without authentication or execution by Borrower.

10.    Each of the following acts, occurrences or omissions shall constitute a "Default" under this Agreement:

(a)    Default in payment when due of any of the payments required to be made to the Lender pursuant to this Agreement; or

(b)    Borrower or any Guarantor shall default in the performance or observance of any term, covenant, condition or agreement on their part to be performed or observed under this Agreement or any other agreement, document or instrument relating to or contemplated by this Agreement; or

(c)    If any creditor of Borrower and/or Guarantor commences any action against Borrower or Guarantor.

(d)    Any default or event of default (howsoever such terms are defined) shall occur or will occur following the giving of notice or the passage of time, or both, under any of the Documents other than the Existing Default.

11.    Notwithstanding anything contained in this Agreement, any agreement, instrument or document relating to or contemplated by this Agreement or the Documents, following the Forbearance Date or upon the occurrence and continuance of any Default, and in every such event, (A) the Lender may, in its sole and arbitrary discretion, proceed to (i) obtain a judgment against Borrower for the amount of the then outstanding Liabilities for which Borrower hereby waives any and all defenses and consents to the entry of such judgment; and (ii) obtain a judgment against Guarantor for the amount of the then outstanding Liabilities for which Guarantor hereby waives any and all defenses through the date of this Agreement and consent to the entry of such judgment; and (B) exercise any right, remedy or power set forth in this Agreement, any agreement, instrument or document relating to or contemplated by this Agreement, the Documents and/or applicable law; or (C) record the Deed. All provisions pertaining to any remedy of the Lender shall be and are severable and cumulative and in addition to all other rights and remedies available to the Lender, at law and in equity, any one or more may be exercised simultaneously or successively.

12.    BORROWER AND GUARANTOR HEREBY EACH IRREVOCABLY AUTHORIZE AND EMPOWER ANY ATTORNEY-AT-LAW TO APPEAR IN ANY COURT OF RECORD AND TO CONFESS JUDGMENT AGAINST ANY OR ALL OF THE BORROWER AND GUARANTOR, JOINTLY AND SEVERALLY, FOR THE UNPAID LIABILITIES TO THE LENDER EVIDENCED BY AN AFFIDAVIT SIGNED BY AN OFFICER OF THE LENDER SETTING FORTH THE AMOUNT THEN DUE, ATTORNEYS' FEES, PARALEGALS' FEES, PLUS COSTS OF SUIT, AND TO RELEASE ALL ERRORS, AND WAIVE ALL RIGHTS OF APPEAL. IF A COPY OF THIS FORBEARANCE AGREEMENT AND ANY OF THE DOCUMENTS, VERIFIED BY AN AFFIDAVIT, SHALL HAVE BEEN FILED IN THE PROCEEDING, IT WILL NOT BE NECESSARY TO FILE THE ORIGINAL AS A WARRANT OF ATTORNEY. BORROWER AND EACH GUARANTOR WAIVE THE RIGHT TO ANY STAY OF EXECUTION AND THE BENEFIT OF ALL EXEMPTION LAWS NOW OR HEREAFTER IN EFFECT. NO SINGLE EXERCISE OF THE FOREGOING WARRANT AND POWER TO CONFESS JUDGMENT WILL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID,

VOIDABLE, OR VOID; BUT THE POWER WILL CONTINUE UNDIMINISHED AND MAY BE EXERCISED FROM TIME TO TIME AS THE LENDER MAY ELECT UNTIL ALL OF THE LIABILITIES HAVE BEEN PAID IN FULL. BORROWER AND EACH GUARANTOR HEREBY WAIVE AND RELEASE ANY AND ALL CLAIMS OR CAUSES OF ACTION WHICH BORROWER OR ANY GUARANTOR MIGHT HAVE AGAINST ANY ATTORNEY ACTING UNDER THE TERMS OF AUTHORITY WHICH BORROWER OR ANY GUARANTOR HAVE GRANTED HEREIN ARISING OUT OF OR CONNECTED WITH THE CONFESSION OF JUDGMENT HEREUNDER.

13.     Borrower and Guarantor each do hereby each release the Lender and its officers, directors, employees, agents, attorneys, personal representatives, successors, predecessors and assigns from all manner of actions, cause and causes of action, suits, deaths, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands, whatsoever, in law or in equity, and particularly, without limiting the generality of the foregoing, in connection with the Documents and any agreements, documents and instruments relating to the Documents and the administration of the Documents and the Liabilities, all indebtedness, obligations and liabilities of Borrower and/or any Guarantor to the Lender and any agreements, documents and instruments relating to the Documents (collectively, the "Claims"), which Borrower and/or any Guarantor now have against the Lender or ever had, or which might be asserted by their heirs, executors, administrators, representatives, agents, successors, or assigns based on any Claims which exist on or at any time prior to the date of this Agreement. Borrower and Guarantor expressly acknowledge and agree that they have been advised by counsel in connection with this Agreement and that they each understand that this paragraph constitutes a general release of the Lender and that they each intend to be fully and legally bound by the same. Borrower and each Guarantor hereby waive any and all defenses any of them have against Lender in any manner whatsoever, including, but not limited to, relating to the Documents, the Liabilities and the administration of the Documents and the Liabilities as of the date hereof. Borrower and each Guarantor further expressly acknowledge and agree that this general release and waiver shall have full force and effect notwithstanding the occurrence of a Default pursuant to this Agreement.

14.     Notwithstanding anything contained in this Agreement, this Agreement (A) does not in any manner constitute any waiver of either (i) any of the Lender's rights, remedies or powers pursuant to (a) the Documents, (b) any other agreement, document or instrument by and between any of the Borrower and/or any Guarantor on the one hand, and the Lender on the other hand, or given, transferred or assigned by any of the Borrower and/or any Guarantor to the Lender or (c) applicable law, or (ii) any default or event of default (howsoever such terms are defined) pursuant to the Documents, any agreement, instrument or document relating to or contemplated by this Agreement, and/or any guaranty of any of the Liabilities; or (B) is not to be construed as an agreement by the Lender to either forbear or allow cure periods at a later date not specifically provided for in this Agreement, any agreement, instrument or document relating to or contemplated by this Agreement or any other applicable agreement, document or instrument.

15.     This Agreement shall be deemed a contract made under the internal laws of the State of Illinois and for all purposes shall be construed in accordance with the laws of the State of Illinois. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. This Agreement may be executed in any number of counterparts, each of which counterparts, once executed and delivered, shall be deemed to be an original and all of which counterparts taken together, shall constitute but one and the same Agreement. This Agreement and any agreement, document or instrument relating to or contemplated by this Agreement, may be executed by any party to this Agreement or any of such agreements, documents or instruments by original signature, facsimile and/or electronic signature. This Agreement shall be binding upon and inure to the benefit of the Lender, Borrower and Guarantor and their respective successors, heirs and assigns. Neither Borrower nor Guarantor shall

LP 6474514.2 \ 37811-99198

assign any of their rights nor delegate any of their obligations under this Agreement without the prior written consent of the Lender and no such consent by the Lender shall, in any event, relieve Borrower or Guarantor of any of their obligations under this Agreement. All payments received by the Lender pursuant to this Agreement shall be applied by the Lender toward the Liabilities in such order as the Lender, in its sole discretion, may from time to time elect. Except as specifically set forth in this Agreement, the Lender makes no covenants to Borrower or Guarantor, including, but not limited to, any other commitments to further forbear. Borrower agrees to pay any and all fees and other out-of-pocket expenses incurred by the Lender in connection with the preparation, administration and enforcement of this Agreement, the Documents and all agreements, documents and instruments relating to or contemplated by this Agreement. In the event of any conflict between this Agreement and any of the Documents, or any agreement, instrument or document relating to or contemplated by this Agreement, this Agreement shall govern and control. All notices required or permitted to be given to or made upon any party hereto shall be made in accordance with the provisions of the Documents.

16.    BORROWER AND GUARANTOR EACH ACKNOWLEDGE THAT THIS AGREEMENT IS BEING SIGNED BY THE LENDER IN PARTIAL CONSIDERATION OF THE LENDER'S RIGHT TO ENFORCE THIS AGREEMENT AND ALL DOCUMENTS (INCLUDING BUT NOT LIMITED TO ALL AGREEMENTS, INSTRUMENTS, AND DOCUMENTS RELATED TO OR CONTEMPLATED BY THIS AGREEMENT), IN COOK COUNTY, ILLINOIS. BORROWER AND GUARANTOR EACH CONSENT TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY FEDERAL OR STATE COURT IN COOK COUNTY, ILLINOIS FOR SUCH PURPOSES AND THEY WAIVE ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND ANY OBJECTION THAT SAID COUNTY IS NOT CONVENIENT. BORROWER AND GUARANTOR EACH WAIVE ANY RIGHTS TO COMMENCE ANY ACTION AGAINST THE LENDER IN ANY JURISDICTION EXCEPT THE AFORESAID COUNTY AND STATE. THE LENDER, BORROWER AND GUARANTOR HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY WITH RESPECT TO ANY MATTER WHATSOEVER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, ALL AGREEMENTS, INSTRUMENTS AND DOCUMENTS RELATING TO OR CONTEMPLATED BY THIS AGREEMENT, THE DOCUMENTS, THE LIABILITIES AND/OR THE TRANSACTIONS WHICH ARE THE SUBJECT OF THIS AGREEMENT AND THE DOCUMENTS. THIS AGREEMENT WAS EXECUTED IN NORTHBROOK, ILLINOIS.

17.    The Preamble shall be part of this Agreement as if it were fully set forth herein.

**[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]**

## SIGNATURE PAGE TO FORBEARANCE AGREEMENT

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**BORROWER:**

**LAKE MICHIGAN BEACH
POTTAWATTAMIE RESORT, LLC,** a
Michigan limited liability company

By: _____

Name: _____

Its: _____

**GUARANTOR:**

_____
Michael E. Olsen

_____
Gary J. Danno

_____
Timothy D. Finnander

_____
Gerald A. Janicke

**LENDER:**

**BCL-BRIDGE FUNDING LLC**

By: _____

Name: _____

Its: _____

EXHIBIT 1

DEED IN LIEU OF FORECLOSURE AGREEMENT

EXHIBIT 2

LOAN BALANCES

NOTE BALANCE:

| | |
|---|---|
| PRINCIPAL | $ 1,336,000.00 |
| INTEREST – 7/19-8/18 | $      80,160.00 |
| INTEREST – 8/19-9/18 | $      80,160.00 |
| DEFERRED INTEREST THRU 9/18 | $    334,720.00 |
| INTEREST CARRY OVER FROM ROSELLE DEAL | $      66,249.74 |
| EXIT FEE | $    300,000.00 |
| REMAINDER OF BROKER'S COMMISSION | $        3,130.00 |

DRAW NOTE BALANCE:

| | |
|---|---|
| PRINCIPAL | $    401,678.94 |
| INTEREST THRU 8/18 | $      15,607.06 |
| INTEREST 8/18-8/19 | $        1,071.14 |
| LEGAL FEES THRU 8/20/15 | $      22,371.01 |
| TOTAL | $ 2,641,147.89 |

DEFAULT INTEREST CONTINUES TO ACCRUE AT THE RATE OF $80,160 FOR EVERY 30 DAY
PERIOD AFTER 9/18 UNDER THE NOTE, AND AT THE RATE OF 4% PER MONTH AFTER 8/18.
DEFERRED INTEREST ALSO CONTINUES TO ACCRUE AS PROVIDED IN THE NOTE.

# EXHIBIT B

# SECURED DRAW PROMISSORY NOTE
# NOTE 1

## SECURED DRAW PROMISSORY NOTE

December 18, 2014

Credit Amount: $500,000.00

Maturity Date: April 18, 2015, or if extended, October 18, 2015 ("Maturity Date")

1. The undersigned, for value received, promises to pay to the order of BCL-BRIDGE FUNDING LLC ("Lender") the principal sum of Five Hundred Thousand Dollars and No Cents ($500,000.00), or so much thereby as may now or hereafter be advanced by Lender to or for the benefit of the undersigned, at the office of the Lender or at such location as any legal holder hereof shall designate as follows:

A. Beginning on January 18, 2015 and continuing on the 18th day of each month thereafter, through and including April 18, 2015 Borrower shall make payments of interest accrued to the date of such payment; and

B. On the Maturity Date, Borrower shall pay all outstanding amounts of principal and interest, fees and costs under this Note.

C. Upon the sale or refinance of any Property, Borrower shall pay to Lender the net proceeds of such sale or refinance after all reasonable and customary closing costs and any existing Permitted Lien (as defined in the Loan Agreement) have been paid, but only to the extent of the balance remaining due under this Note. For purposes of this section, the term "net proceeds" shall mean gross sales price or refinance amount, less customary and reasonable closing costs, and broker's commissions (broker must not be related to or an affiliate of the Borrower).

2. Interest shall accrue on this Note at a rate of 24% per annum. Upon the occurrence and continuance of an Event of Default, this Note shall bear interest at a rate of 48% per annum. Interest shall continue to accrue on this Note until this Note is paid in full. Interest shall accrue when payments received are not collected funds and until such funds are collected.

3. This Note may be prepaid in whole only by paying the outstanding principal balance of this Note, plus interest payments then due and owing, plus any costs or expenses of Lender.

4. The undersigned, any endorsers and accommodation parties hereby waive presentment, demand, notice of dishonor and protest. This Note evidences the Loan under of that certain Loan and Security Agreement dated as of the date of this Note, as may be amended, modified and/or restated from time to time, by and between Lender and the undersigned (said Loan and Security Agreement, as may be amended, modified and/or restated from time to time shall be hereinafter referred to as the "Loan Agreement"), and is the Note as defined in the Loan Agreement. The terms and provisions of the Loan Agreement are incorporated in their entirety into this Note by this reference. All terms not defined herein shall have the same meanings herein as in the Loan Agreement.

LP 5770188.3 \ 37811-99198

5.    This Note has been executed and delivered at Chicago, Illinois, and shall be governed by the laws of the State of Illinois. The undersigned acknowledges and agrees that the loan that is the subject of this Note is a business loan which comes within the purview of Section 205/4, paragraph 1(c) of chapter 815 of the Illinois Compiled Statutes, as may be amended or replaced from time to time. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision, or the remaining provisions of this Note, or any provision of the Loan Agreement or any other agreement between the undersigned and Lender.

6.    EACH OF THE UNDERSIGNED HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY-AT-LAW TO APPEAR IN ANY COURT OF RECORD AND TO CONFESS JUDGMENT AGAINST THE UNDERSIGNED, FOR THE AMOUNTS DUE AND OWING UNDER THIS NOTE AS EVIDENCED BY AN AFFIDAVIT SIGNED BY AN OFFICER OF LENDER SETTING FORTH THE AMOUNT THEN DUE, ATTORNEYS' FEES PLUS COSTS OF SUIT, AND TO RELEASE ALL ERRORS, AND WAIVE ALL RIGHTS OF APPEAL. IF A COPY OF THIS NOTE, VERIFIED BY AN AFFIDAVIT, SHALL HAVE BEEN FILED IN THE PROCEEDING, IT WILL NOT BE NECESSARY TO FILE THE ORIGINAL AS A WARRANT OF ATTORNEY. EACH OF THE UNDERSIGNED WAIVES THE RIGHT TO ANY STAY OF EXECUTION AND THE BENEFIT OF ALL EXEMPTION LAWS NOW OR HEREAFTER IN EFFECT. NO SINGLE EXERCISE OF THE FOREGOING WARRANT AND POWER TO CONFESS JUDGMENT WILL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, VOIDABLE, OR VOID; BUT THE POWER WILL CONTINUE UNDIMINISHED AND MAY BE EXERCISED FROM TIME TO TIME AS LENDER MAY ELECT UNTIL ALL OF THE LIABILITIES HAVE BEEN PAID IN FULL. EACH OF THE UNDERSIGNED HEREBY WAIVES AND RELEASES ANY AND ALL CLAIMS OR CAUSES OF ACTION WHICH EACH OF THE UNDERSIGNED MIGHT HAVE AGAINST ANY ATTORNEY ACTING UNDER THE TERMS OF AUTHORITY WHICH THE UNDERSIGNED HAS GRANTED HEREIN ARISING OUT OF OR CONNECTED WITH THE CONFESSION OF JUDGMENT HEREUNDER.

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK-

SIGNATURE PAGE TO FOLLOW

2

SECURED DRAW PROMISSORY NOTE – SIGNATURE PAGE

WHEREFORE, the undersigned executes this term note on the date referenced above.

LAKE MICHIGAN BEACH POTTAWATTAMIE RESORT, LLC

By: _____

Its: _____

# EXHIBIT C

# SECURED PROMISSORY NOTE
# NOTE 2

## SECURED PROMISSORY NOTE

December 18, 2014

Credit Amount: $1,336,000.00

Maturity Date: April 18, 2015, or if extended, October 18, 2015 ("Maturity Date")

1.  The undersigned, for value received, promises to pay to the order of BCL-BRIDGE FUNDING LLC ("Lender") the principal sum of One Million Three Hundred Thirty-Six Thousand Dollars and No Cents ($1,336,000.00), or so much thereby as may now or hereafter be advanced by Lender to or for the benefit of the undersigned, at the office of the Lender or at such location as any legal holder hereof shall designate as follows:

    A. Beginning on January 18, 2015 and continuing on the 18th day of each month thereafter, through and including April 18, 2015 Borrower shall make payments of interest only in the amount of $6,500.00; and

    B. Beginning on May 18, 2015 and continuing on the 18th day of each month thereafter through and including October 18, 2015, if Borrower has not paid the Loan in full, Borrower shall make payments of interest in the amount of $13,360.00; and

    C. On the Maturity Date, Borrower shall pay all outstanding amounts of principal and interest, fees and costs under this Note. The principal amount to be repaid to Lender hereunder shall be as set forth in the "Payoff" column on the attached Exhibit "A" schedule (the "Schedule"). For purposes of clarity, payments made pursuant to paragraphs 1(A) and 1(B) above, shall not be credits against the total Payoff amount as provided in the Schedule.

    D. Upon the sale or refinance of any Property, Borrower shall pay to Lender the net proceeds of such sale or refinance after all reasonable and customary closing costs and any existing Permitted Lien (as defined in the Loan Agreement) have been paid, but only to the extent of the balance remaining due under this Note. For purposes of this section, the term "net proceeds" shall mean gross sales price or refinance amount, less customary and reasonable closing costs, and broker's commissions (broker must not be related to or an affiliate of the Borrower).

2.  Upon the occurrence and continuance of an Event of Default, this Note shall bear interest at a rate of $80,160.00 per month. Interest shall continue to accrue on this Note until this Note is paid in full. Interest shall accrue when payments received are not collected funds and until such funds are collected.

3.  This Note may be prepaid in whole only by paying the amount set forth in the Schedule for the applicable month of the term, plus interest payments through the first Maturity Date plus any costs or expenses of Lender.

4.  The undersigned, any endorsers and accommodation parties hereby waive presentment, demand, notice of dishonor and protest. This Note evidences the Loan under of that certain Loan and Security Agreement dated as of the date of this Note, as may be amended, modified and/or restated from time to time, by and between Lender and the

undersigned (said Loan and Security Agreement, as may be amended, modified and/or restated from time to time shall be hereinafter referred to as the "Loan Agreement"), and is the Note as defined in the Loan Agreement. The terms and provisions of the Loan Agreement are incorporated in their entirety into this Note by this reference. All terms not defined herein shall have the same meanings herein as in the Loan Agreement.

5. This Note has been executed and delivered at Chicago, Illinois, and shall be governed by the laws of the State of Illinois. The undersigned acknowledges and agrees that the loan that is the subject of this Note is a business loan which comes within the purview of Section 205/4, paragraph 1(c) of chapter 815 of the Illinois Compiled Statutes, as may be amended or replaced from time to time. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision, or the remaining provisions of this Note, or any provision of the Loan Agreement or any other agreement between the undersigned and Lender.

6. EACH OF THE UNDERSIGNED HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY-AT-LAW TO APPEAR IN ANY COURT OF RECORD AND TO CONFESS JUDGMENT AGAINST THE UNDERSIGNED, FOR THE AMOUNTS DUE AND OWING UNDER THIS NOTE AS EVIDENCED BY AN AFFIDAVIT SIGNED BY AN OFFICER OF LENDER SETTING FORTH THE AMOUNT THEN DUE, ATTORNEYS' FEES PLUS COSTS OF SUIT, AND TO RELEASE ALL ERRORS, AND WAIVE ALL RIGHTS OF APPEAL. IF A COPY OF THIS NOTE, VERIFIED BY AN AFFIDAVIT, SHALL HAVE BEEN FILED IN THE PROCEEDING, IT WILL NOT BE NECESSARY TO FILE THE ORIGINAL AS A WARRANT OF ATTORNEY. EACH OF THE UNDERSIGNED WAIVES THE RIGHT TO ANY STAY OF EXECUTION AND THE BENEFIT OF ALL EXEMPTION LAWS NOW OR HEREAFTER IN EFFECT. NO SINGLE EXERCISE OF THE FOREGOING WARRANT AND POWER TO CONFESS JUDGMENT WILL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, VOIDABLE, OR VOID; BUT THE POWER WILL CONTINUE UNDIMINISHED AND MAY BE EXERCISED FROM TIME TO TIME AS LENDER MAY ELECT UNTIL ALL OF THE LIABILITIES HAVE BEEN PAID IN FULL. EACH OF THE UNDERSIGNED HEREBY WAIVES AND RELEASES ANY AND ALL CLAIMS OR CAUSES OF ACTION WHICH EACH OF THE UNDERSIGNED MIGHT HAVE AGAINST ANY ATTORNEY ACTING UNDER THE TERMS OF AUTHORITY WHICH THE UNDERSIGNED HAS GRANTED HEREIN ARISING OUT OF OR CONNECTED WITH THE CONFESSION OF JUDGMENT HEREUNDER.

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK-

SIGNATURE PAGE TO FOLLOW

2

### SCHEDULE A - PRINCIPAL PAYOFF AMOUNTS

**AMOUNTS BELOW ARE EXCLUSIVE OF ANY INTEREST PAYMENTS DUE UNDER PARAGRAPHS 1 AND 2 OF THIS NOTE**

| PAYOFF DATE | PRINCIPAL PAYOFF AMOUNT |
|---|---|
| December 18, 2014 -- April 18, 2015 | $1,470,320.00 |
| April 19, 2015 -- May 18, 2015 | $1,510,400.00 |
| May 19, 2015 -- June 18, 2015 | $1,550,480.00 |
| June 19, 2015 -- July 18, 2015 | $1,590,560.00 |
| July 19, 2015 -- August 18, 2015 | $1,630,640.00 |
| August 19, 2015 -- September 18, 2015 | $1,670,720.00 |
| September 19, 2015 -- October 18, 2015 | $1,710,800.00 |
| After October 18, 2015* | Principal payoff amount increases $80,160 for every 30 day period with the new principal amount becoming effective on the first day of each new 30 day period (i.e. on October 19, 2015 the new principal payoff amount will be $1,790,960.00 and will remain at that payoff amount through November 18, 2015) |

*Note matures on October 18, 2015 if Extension Option is in effect. Nothing contained in the above schedule shall be deemed an agreement by the Lender to further extend the Maturity Date.

4

# EXHIBIT D

# FORECLOSURE NOTICE AND AFFIDAVIT OF PUBLICATION FOR THE FORECLOSURE NOTICE

## FORECLOSURE NOTICE

MORTGAGE SALE — Default has been made in the conditions of a certain mortgage made by Lake Michigan Beach Pottawattamie Resort, LLC, a Michigan limited liability company, to BCL-Bridge Funding LLC, an Illinois limited liability company, Mortgagee, dated December 18, 2014, and recorded on January 22, 2015, in Liber 3092 on page 2827, Berrien County Records, Michigan and as amended by Amendment No. 1 to Mortgage, dated October 30, 2015, and recorded on November 10, 2015, in Liber 3120 on page 1118, Berrien County Records, Michigan, on which mortgage there is claimed to be due as of the date hereof the sum of Two Million Seven Hundred Sixty Nine Five Thousand Five Hundred Ten Dollars and Fifty-Four Cents ($2,769,510.54), including interest.

Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that said mortgage will be foreclosed by sale of the mortgaged premises or some part of them, at public venue, at the Berrien County Courthouse, 3rd Floor, 811 Port Street, St. Joseph, Michigan 49085, at 11:00 a.m. on Thursday, December 17, 2015.

Said premises are situated in Berrien County, Michigan and are described as:

Land situated in the Township of Hagar, County of Berrien, State of Michigan, described as follows:

PARCEL A:

That part of the North Fractional Half of Section 21 and that part of the Northwest quarter of Section 22, Township 3 South, Range 18 West, described as follows: Commencing 1327.6 feet North of the quarter post between said sections; Thence West about 600.0 feet to the Southeast corner of Lot 7, recorded Plat of Pottawatomie Park, recorded in Liber 3 of Plats, Page 47; Thence North 14 deg. 30' East to the Northeast corner of Lot 1, said plat; Thence North 14 deg. 30' East 30.0 feet across Arbor Avenue; Thence North 85 deg. 30' West 99.0 feet along Arbor Avenue; Thence North 50 deg. 30' East, along Eastern Avenue, 228.0 feet; Thence North 39 dog. 30' West across Eastern Avenue along the Northeasterly line of Lot 20, said plat, across Bluff Street, 140.0 feet; Thence South 50 deg. 30' West 295.0 feet; Thence South 14 deg. 30' West about 36.0 feet, all along the West line of said Bluff Street to the so-called road to lake; Thence Northwesterly, along the center of road to lake, to the water's Edge of Lake Michigan; Thence

Northeasterly, along said water's edge, to the South line of Lot 17, recorded plat of Calay's Addition to Pottawattamie Park, recorded in Liber 5 of Plats, Page 42, produced West to said water's edge; Thence East, along the South line of Lots 17 and 14 of said plat, across Fractional Sections 21 and 22, to the center of the Lake Shore Road, also called Hagar Shore Road; Thence Southwesterly, along the center of said road to the place of beginning. (The above description includes within its boundaries, Lots 1 to 13, inclusive, and Lots 18 to 33, inclusive, said Calay's Addition to Pottawattamie Park, as recorded in Liber 5 of Plats, Page 42, Berrien County Records.)

ALSO, that part of the Northwest quarter of said Section 22, described as follows: the North 35.0 feet of the following description commencing at the West quarter post of said Section 22; Thence North 1314.06 feet; Thence North 9 deg. 45' East 709.06 feet to the place of beginning of the parcel of land herein described; Thence South 9 deg. 45' West 253.66 feet; Thence South 87 deg. 59' East 550.4 feet to the West line of Highway US-31; Thence Northeasterly, along the West line of said highway, to a point that is South 87 deg. 59' East of the place of beginning; Thence North 87 deg. 59' West, along a line parallel to and 250.0 feet from the South line of this described parcel of land, to the place of beginning;

Excepting therefrom that part thereof lying in Hagar Shore Road;

Also Excepting therefrom all streets and rights of way dedicated to the use of the public;

Also Excepting therefrom commencing at the Northeast corner of Lot 1, said plat of Pottawatomie Park; Thence Southerly at right angles with the North line of said Lot 1,178.0 feet to the intersection with the Southerly line of Lot 4, said plat, produced Easterly; Thence Westerly, along said produced line, 11.0 feet to the Southeast corner of said Lot 4; Thence Northerly, along lot line, 180.0 feet to the place of beginning;

Also Excepting that part of Lots 6 through 13 inclusive Calay's Addition to Pottawattamie Park, according to the plat thereof, as recorded in Liber 5 of Plats, Page 42, described as follows: Beginning at the Northeast corner of said Lot 13; Thence South 10 deg. 30' 30" West along the Easterly line of said Calay's Addition (recorded South 9 deg. East), 352,44 feet; Thence North 74 deg. 40 21" West, 210,10 feet to the Easterly line of Popular Street; Thence North 10 deg. 24' 59" East along said Easterly Street line, 296.90 feet to the Northerly line of said Lot 13; Thence South 89 deg. 14' 47" East (recorded West) along said Northerly line, 220.11 feet to the place of beginning;

Also Except that part of Lots 18 through 23 inclusive and part of Lots 26 through 28 inclusive, Calay's Addition to Pottawattamie Park, according to the plat thereof, recorded in Liber 5 of Plats, Page 42 and part of the Northeast quarter of Section 21, Township 3 South, Range 18 West, said Hagar Township, described as follows: Beginning at the Northeast corner of said Lot 18; Thence South 10 deg. 24' 59" West along the Westerly line of Popular Street, 289.21 feet; Thence North 74 deg. 40' 21" West, 20.30 feet; Thence North 89 deg. 14' 47" West parallel to and 280,00 feet South of the North line of said Lot 18, 648 feet more or less to the water's edge of Lake Michigan; Thence Northeasterly along said water's edge to a point on the North line extended of said Lot 18; Thence South 89 deg. 14' 47" East, 546 feet more or less to the place of beginning;

Also Excepting, and grantor shall retain, subject to the terms below, that part of the Northeast quarter of Section 21, Town 3 South, Range 18 West, described as beginning at the most South corner of Lot 32, Calay's Addition to Pottawattamie Park, as recorded in Liber 5 of Plats, Page 42; Thence North 39 deg. 42' 50" West (recorded North 39 deg. 30' West) along the Southerly line of said Lot 32, 112.00 feet to the top of a bluff; Thence South 36 deg. 43' 22" West along said bluff, 51.17 feet to the Northerly line of Pottawattamie Park, as recorded in Borden County Plats; Thence South 39 deg. 42' 50" East along said Northerly plat line, 100.00 feet to the Northwesterly line of Eastern Avenue; Thence North 50 deg. 17' 10" East along said Northwesterly line, 49.74 feet to the point of beginning. Subject to an ingress and egress easement over the Northwesterly ten feet thereof along the bluff for owners of Pottawattamie Resort to access and maintain the stairs:

Together with a Ten foot wide non-exclusive easement for access to Lake Michigan with the centerline thereof described as commencing at said most South corner of Lot 32, Calay's Addition to Pottawattamie Park; Thence North 39 deg. 42' 50" West (recorded North 39 deg. 30' West) along the Southerly line of said Lot 32, 112.00 feet to the top of a bluff; Thence South 36 deg. 43' 22" West along said bluff, 33.17 feet to the point of beginning of this centerline; Thence North 43 deg. 00' 00" West along said centerline being stairs, 115.00 feet; Thence North 88 deg. 00' 00" West along said centerline being a path, 285 feet more or less to the water's edge of Lake Michigan and point of ending of this centerline.

Also Excepting therefrom Pottawattamie Resort Condominiums, consisting of 22 Units, and recorded in Liber 228 of Condominiums, Page 1, Berrien County Records, more particularly described as:

PHASE 1-A (Units 13 through 22, inclusive):

Description of a parcel of land located in the Northeast quarter of Section 21, Town 3 South, Range 18 West, Hagar Township, Berrien County, Michigan, more particularly described as part Lots 23 through 32 of Calay's Addition to Pottawattamie Park, as recorded in Liber 5 of Plats, Page 42, Berrien County Records, Commencing at the East quarter post of said Section 21, Thence North 00 deg. 00' 00" East along the East line of said Northeast quarter, 2201.43 feet; Thence North 90 deg. 00' 00" West, 145.88 feet to the point of beginning of the herein described parcel; Thence South 10 deg. 25' 00" West, 109.39 feet, to the Westerly line of Eastern Avenue; Thence South 50 deg. 17' 10" West, (platted South 50 deg. 30' West), along said Westerly line, 154.09 feet; Thence North 39 deg. 42' 50" West, leaving said Westerly line, 43.04 feet; Thence North 74 deg. 52' 23" West, 98.70 feet; Thence North 39 deg. 42' 50" West, 40.00 feet; Thence South 56 deg. 54' 09" West, 99.42 feet; Thence South 77 deg. 48' 22" West, 100.00 feet; Thence North 88 deg. 00' 00" West, 84.84 feet to reference Point "A"; Thence continuing North 88 deg. 00' 00" West, 202 feet more or less to Lake Michigan; Thence Northeasterly, along Lake Michigan, 218 feet more or less to a point bearing North 89 deg., 14' 47" West of reference Point "B" (said reference Point "B" bears North 39 deg. 58' 47" East, 253.17 feet from said reference Point "A"); Thence South 89 deg. 14' 47" East, 259 feet more or less to reference Point "B"; Thence continuing South 89 deg. 14' 47" East, 389.84 feet to the Point of Beginning.

PHASE 1-B (Units 1 through 12, inclusive):

Description of a parcel of land located in the Northeast quarter of Section 21, Town 3 South, Range 18 West, Hagar Township, Berrien County, Michigan, more particularly described as part of Lots 1, 2 and 33 of Calay's Addition to Pottawattamie Park, as recorded in Liber 5 of Plats, Page 42, Berrien County Records; Commencing at the East quarter post of said Section 21, Thence North 00 deg. 00' 00" East along the East line of said Northeast quarter, 1725.41 feet; Thence North 90 deg. 00' 00" West, 149.86 feet to the Point of Beginning of the herein described parcel; Thence South 08 deg. 06' 32" West, 133.96 feet to the Northerly line of Arbor Avenue; Thence North 86 deg. 10' 26" West (Platted North 86 deg. 30' West), along said Northerly line, 37.55 feet; Thence North 81 deg. 52' 13" West (Platted North 84 deg. West), along said Northerly line, 220.86 feet; Thence North 08 deg. 06' 32" East, leaving said Northerly line, 136.69 feet; Thence South 81 deg. 53' 28" East, 258.31 feet to the Point of Beginning.

PARCEL B:

Units 1, 4, 7 and 12, of Pottawattamie Resort Condominiums, according to the Master Deed thereof recorded in Liber 228 of Condominiums, Pages 1 through 90, both inclusive, Berrien County Records, and amendments thereto, and designated as Berrien County Condominium Subdivision Plan No. 228 and any amendments thereto, together with an undivided interest in the common elements of said condominium as set forth in said Master Deed, and any amendments thereto, as described in Act 59 of the Public Acts of Michigan of 1978, as amended.

And

THE SOUTHEASTERLY 110 FEET OF LOT 31, CALAY'S ADDITION TO POTTAWATTAMIE PARK, BEING A SUBDIVISION IN PART OF SECTIONS 21 AND 22, TOWNSHIP 3 SOUTH, RANGE 18 WEST, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN LIBER 5 OF PLATS, PAGE 42, BERRIEN COUNTY RECORDS.

T.I.N.:11-10-1140-0001-03-1

Commonly known as: Pottawattamie Resort, 4766 Arbor Avenue, Coloma, Michigan

Any right of redemption has been waived by the Mortgagor.

Dated: November 19, 2015                    BCL-BRIDGE FUNDING LLC, Mortgagee

Jamie L. Burns, Levenfeld Pearlstein LLC, 2 N. LaSalle Street, Suite 1300, Chicago, Illinois 60602, Phone: (312) 346-8380, Attorneys for Mortgagee

# AFFIDAVIT OF PUBLICATION

Page 1
IN THE MATTER OF

MORTGAGE SALE

LAKE MICHIGAN BEACH
POTTAWATTAMIE RESORT, LLC

STATE OF MICHIGAN}
County of Berrien

Jessica Bramblette being duly sworn, deposes and says the annexed printed copy of a notice was taken from the Berrien County Record, a newspaper printed and circulated in said State and County, and that said notice was published in said newspaper on:

November 19, November 26,
December 3, December 10

A.D. 2015,, that he is the agent of the printers of said newspaper, and knows well the facts stated therein.

_Jessica Bramblette_
Jessica Bramblette
Subscribed and sworn to before me on this

_10th_ day of _December_ A.D. 2015

My commission expires _10-11-2017_

_Janet Mitchell_

**JANET MITCHELL**
NOTARY PUBLIC
STATE OF MICHIGAN
COUNTY OF BERRIEN
MY COMMISSION EXPIRES OCTOBER 11, 2017

**FORECLOSURE NOTICE**
MORTGAGE SALE — Default has been made in the conditions of a certain mortgage made by Lake Michigan Beach Pottawattamie Resort, LLC., a Michigan limited liability company, to BCL-Bridge Funding LLC, an Illinois limited liability company, Mortgagee, dated December 18, 2014, and recorded on January 22, 2015, in Liber 3092 on page 2827, Berrien County Records, Michigan and as amended by Amendment No. 1 to Mortgage, dated October 30, 2015, and recorded on November 10, 2015, in Liber 3120 on page 1118, Berrien County Records, Michigan, on which mortgage there is claimed to be due as of the date hereof the sum of Two Million Seven Hundred Sixty-Nine Five Thousand Five Hundred Ten Dollars and Fifty-Four Cents ($2,769,510.54), including interest.

Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that said mortgage will be foreclosed by sale of the mortgaged premises or some part of them, at public venue, at the Berrien County Courthouse, 3rd Floor, 811 Port Street, St. Joseph, Michigan 49085, at 11:00 a.m. on Thursday, December 17, 2015.

Said premises are situated in Berrien County, Michigan and are described as:

Land situated in the Township of Hagar, County of Berrien, State of Michigan, described as follows:

PARCEL A:
That part of the North Fractional Half of Section 21 and that part of the Northwest quarter of Section 22, Township 3 South, Range 18 West, described as follows: Commencing 1327.8 feet North of the quarter post between said sections; Thence West about 800.0 feet to the Southeast corner of Lot 7, recorded Plat of Pottawatomie Park, recorded in Liber 3 of Plats, Page 47; Thence North 14 deg. 30' East to the Northwest corner of Lot 1, said plat; Thence North 14 deg. 30' East 30.0 feet across Arbor Avenue; Thence North 85 deg. 30' West 95.0 feet along Arbor Avenue; Thence North 60 deg. 30' East, along Eastern Avenue, 228.0 feet; Thence North 39 deg. 30' West across Eastern Avenue along the Northeasterly line of Lot 20, said plat, across Bluff Street, 140.0 feet; Thence South 50 deg. 30' West 295.0 feet; Thence South 14 deg. 30' West about 36.0 feet, all along the West line of said Bluff Street to the so-called road to lake; Thence Northwesterly, along the center of road to lake, to the water's Edge of Lake Michigan; Thence Northeasterly, along said water's edge, to the South line of Lot 17, recorded plat of Calay's Addition to Pottawattamie Park, record-

ed in Liber 5 of Plats, Page 42, produced West to said water's edge; Thence East, along the South line of Lots 17 and 14 of said plat, across Fractional Sections 21 and 22, to the center of the Lake Shore Road, also called Hagar Shore Road; Thence Southwesterly, along the center of said road to the place of beginning. (The above description includes within its boundaries, Lots 1 to 18 inclusive, and Lots 18 to 33, inclusive, said Calay's Addition to Pottawattamie Park, as recorded in Liber 5 of Plats, Page 42, Berrien County Records).

ALSO, that part of the Northwest quarter of said Section 22, described as follows: the North 36.0 feet of the following description, commencing at the West quarter post of said Section 22; Thence North 1314.06 feet; thence North 8 deg. 45' East 709.06 feet to the place of beginning of the parcel of land herein described; thence South 8 deg. 45' West 253.96 feet; thence South 87 deg. 45' East 650.4 feet to the West line of Highway US-31; Thence Northeasterly, along the West line of said highway, to a point that is South 87 deg. 59' East of the place of beginning; Thence North 87 deg. 59' West, along a line parallel to and 250.0 feet from the South line of this described parcel of land, to the place of beginning.

Excepting therefrom that part thereof lying in Hagar Shore Road.

Also Excepting, therefrom all streets and rights of way dedicated to the use of the public.

Also Excepting, therefrom, commencing at the Northeast corner of Lot 1, said plat of Pottawattamie Park; Thence Southerly, at right angles with the North line of said Lot 1, 176.0 feet to the intersection with the Southerly line of Lot 4, said plat, produced Easterly; Thence Westerly, along said produced line, 11.0 feet to the Southeast corner of said Lot 4; Thence Northerly, along lot line, 180.0 feet to the place of beginning.

Also Excepting that part of Lots 6 through 13, inclusive Calay's Addition to Pottawattamie Park, according to the plat thereof, as recorded in Liber 5 of Plats, Page 42, described as follows: Beginning at the Northeast corner of said Lot 13; Thence South 10 deg. 30' West along the Easterly line of said Calay's Addition (recorded South 9 deg. East), 352.44 feet; Thence North 74 deg. 40' 21" West, 210.10 feet to the Easterly line of Popular Street; Thence North 10 deg. 24' 59" East along said Easterly Street line, 266.90 feet to the Northerly line of said Lot 13; thence South 89 deg. 14' 21" East (recorded West) along said Northerly line, 220.1 feet to the place of beginning.

Also Except that part of Lots 18 through 23 inclusive and part of Lots 26 through 28, inclusive, Calay's Addition to Pottawattamie Park, according to the plat thereof, recorded in Liber 5 of Plats, Page 42 and part of the Northeast quarter of Section 21, Township 3 South, Range 18 West, said Hagar Township, described as follows: Beginning at the

# AFFIDAVIT OF PUBLICATION

Page 2
IN THE MATTER OF

MORTGAGE SALE

LAKE MICHIGAN BEACH
POTTAWATTAMIE RESORT, LLC

STATE OF MICHIGAN}
County of Berrien

Jessica Bramblette being duly sworn, deposes and
says the annexed printed copy of a notice was taken
from the Berrien County Record, a newspaper printed
and circulated in said State and County, and that said
notice was published in said newspaper on:

November 19, November 26,
December 3, December 10

A.D. 2015, that he is the agent of the printers of the
newspaper, and knows well the facts stated therein.

_____
                    Jessica Bramblette
Subscribed and sworn to before me on this
10th day of December   A.D. 2015

My commission expires   10-11-2017

_____

**JANET MITCHELL**
NOTARY PUBLIC
STATE OF MICHIGAN
COUNTY OF BERRIEN
MY COMMISSION EXPIRES OCTOBER 11, 2017

Northeast corner of said Lot 18; Thence
South 10 deg. 24' 59" West along the
Westerly line of Popular Street, 269.21
feet; Thence North 74 deg. 40' 21" West,
20.30 feet; Thence North 89 deg. 14' 47"
West parallel to and 280.00 feet South
of the North line of said Lot 18, 648 feet
more or less to the water's edge of Lake
Michigan; Thence Northeasterly along
said water's edge to a point on the North
line extended of said Lot 18; Thence
South 89 deg. 14' 47" East, 546. feet
more or less to the place of beginning;
   Also Excepting, and grantor shall
retain, subject to the terms below, that
part of the Northeast quarter of Section
21, Town 3 South, Range 18 West, de-
scribed as beginning at the most South
corner of Lot 32, Celay's Addition to Pot-
tawattamie Park, as recorded in Liber
5 of Plats, Page 42; Thence North 39
deg. 42' 50" West (recorded North 39
deg. 30' West) along the Southerly line
of said Lot 32, 112.00 feet to the top of a
bluff; Thence South 36 deg. 43' 22" West
along said bluff, 51.17 feet to the North-
erly line of Pottawattamie Park, as re-
corded in Borden County Plats; Thence
South 39 deg. 42' 50", East along said
Northerly plat line, 100.00 feet to the
Northwesterly line of Eastern Avenue;
Thence North 50 deg. 17' 10" East along
said Northwesterly line, 49.74 feet to the
point of beginning. Subject to an ingress
and egress easement over the North-
westerly ten feet thereof along the bluff
for owners of Pottawattamie Resort to
access and maintain the stairs;
   Together with a Ten foot wide non-
exclusive easement for access to Lake
Michigan with the centerline thereof
described as commencing at said most
South corner of Lot 32, Celay's Addition
to Pottawattamie Park; Thence North 39
deg. 42' 50" West (recorded North 39
deg. 30' West) along the Southerly line
of said Lot 32, 112.00 feet to the top of a
bluff; Thence South 36 deg. 43' 22" West
along said bluff, 33.17 feet to the top of
beginning of this centerline; Thence
North 43 deg. 00' 00" West along said
centerline being stairs. 115.00 feet;
Thence North 88 deg. 00' 00" West
along said centerline being a path, 285
feet more or less to the water's edge of
Lake Michigan and point of ending of
this centerline.
   Also Excepting therefrom Pottawattamie
Resort Condominiums; consisting of 22
Units, and recorded in Liber 228 of Con-
dominiums, Page 1, Berrien County Re-
cords, more particularly described as:
   PHASE 1-A (Units 13 through 22, In-
clusive);

Description of a parcel of land located
in the Northeast quarter of Section 21,
Town 3 South, Range 18 West, Hagar
Township, Berrien County, Michigan,
more particularly described as part Lots
23 through 32 of Celay's Addition to Pot-
tawattamie Park, as recorded in Liber 5
of Plats, Page 42, Berrien County Re-
cords; Commencing at the East quarter
post of said Section 21; Thence North
00 deg. 00' 00" East along the East line
of said Northeast quarter, 2201.43 feet;
Thence North 90 deg. 00' 00" West,
145.88 feet to the point of beginning
of the herein described parcel; Thence
South 10 deg. 26' 00" West, 109.39 feet;
to the Westerly line of Eastern Avenue;
Thence South 50 deg. 17' 10" West;
(platted South 50 deg. 30' West) along
said Westerly line, thence continuing
North 39 deg. 42' 50" West, leaving said
Westerly line, 43.04 feet; Thence North
74 deg. 52' 23" West, 88.70 feet; Thence
North 39 deg. 42' 50" West, 40.00 feet;
Thence South 56 deg. 54' 09" West,
99.42 feet; Thence South 77 deg. 44'
22" West, 100.00 feet; Thence North 88
deg. 00' 00" West, 84.84 feet to refer-
ence Point "A"; Thence continuing North
88 deg. 00' 00" West, 202 feet more or
less to Lake Michigan; Thence North-
easterly along Lake Michigan, 218 feet
more or less to a point bearing North 89
deg. 14' 47" West of reference Point "B"
(said reference Point "B" bears North 39
deg. 59' 47" East, 253.17 feet from said
reference Point "A"); Thence South 89
deg. 14' 47" East, 259 feet more or less
to reference Point "B"; Thence continu-
ing South 89 deg. 14' 47" East; 389.84
feet to the Point of Beginning.
   PHASE 1-B (Units 1 through 12, Inclu-
sive);
   Description of a parcel of land located
in the Northeast quarter of Section 21,
Town 3 South, Range 18 West, Hagar
Township, Berrien County, Michigan,
more particularly described as part of
Lots 1, 2 and 33 of Celay's Addition to
Pottawattamie Park, as recorded in Liber
5 of Plats, Page 42, Berrien County Re-
cords; Commencing at the East quarter
post of said Section 21; Thence North
00 deg. 00' 00" East along the East line
of said Northeast quarter, 1725.41 feet;
Thence North 90 deg. 00' 00" West,
149.86 feet to the Point of Beginning
of the herein described parcel; Thence
South 08 deg. 06' 32" West, 133.96 feet
to the Northerly line of Arbor Avenue;
Thence North 86 deg. 10' 26" West
(Platted North 86 deg. 30' West), along
said Northerly line, 37.55 feet; Thence
North 31 deg. 62' 13", West (Platted
North 84 deg. West), along said North-
erly line, 220.86 feet; Thence North 08
deg. 06' 32" East, leaving said Northerly
line, 136.89 feet; Thence South 81 deg.
53' 28" East, 258.31 feet to the Point of
Beginning.

# AFFIDAVIT OF PUBLICATION

PAGE 3
IN THE MATTER OF

MORTGAGE SALE

LAKE MICHIGAN BEACH
POTTAWATTAMIE RESORT, LLC

STATE OF MICHIGAN}
County of Berrien

Jessica Bramblette being duly sworn, deposes and
says the annexed printed copy of a notice was taken
from the Berrien County Record, a newspaper printed
and circulated in said State and County, and that said
notice was published in said newspaper on:

November 19, November 26,
December 3, December 10

A.D. 2015,, that he is the agent of the printers of said
newspaper, and knows well the facts stated therein.

_____
Jessica Bramblette
Subscribed and sworn to before me on this
_____ day of _____ A.D. 2015

My commission expires _____ 10-11-2017 _____

**JANET MITCHELL**
NOTARY PUBLIC
STATE OF MICHIGAN
COUNTY OF BERRIEN
MY COMMISSION EXPIRES OCTOBER 11, 2017

PARCEL B:
Units 1, 4, 7 and 12, of Pottawattamie
Resort Condominiums, according to the
Master Deed thereof recorded in Liber
228 of Condominiums, Pages 1 through
90, both inclusive, Berrien County Re-
cords, and amendments thereto, and
delineated as Berrien COUNTY Condo-
minium Subdivision Plan No. 228 and
any amendments thereto, together with
an undivided interest in the common ele-
ments of said condominium as set forth
in said Master Deed, and any amend-
ments thereto, as described in Act 59 of
the Public Acts of Michigan of 1978, as
amended.
And,
THE SOUTHEASTERLY 110 FEET
OF LOT 31, DALAY'S ADDITION TO
POTTAWATTAMIE PARK, BEING A
SUBDIVISION IN PART OF SECTIONS
21 AND 22, TOWNSHIP 3 SOUTH,
RANGE 16 WEST, ACCORDING TO
THE PLAT THEREOF, AS RECORDED
IN LIBER 6 OF PLATS, PAGE 42, BER-
RIEN COUNTY RECORDS.
T.I.N. 11-10-1140-0001-05-1
Commonly known as: Pottawattamie
Resort, 4769 Arbor Avenue, Coloma,
Michigan
Any right of redemption has been
waived by the Mortgagor.
Dated: November 19, 2015
BCL BRIDGE FUNDING, LLC, Mort-
gagee
Jamie L. Burns
Levenfeld Pearlstein, LLC
2 N. LaSalle Street, Suite 1300
Chicago, Illinois 60602
Phone: (312) 346-8380
Attorneys for Mortgagee
Publish Nov. 19, 26, Dec. 3 and 10,
2015

# EXHIBIT E

# BROKER LISTING

**Vacant Land    Active    Customer Detail Report        4766 ARBOR Avenue, Coloma, MI 49038        $3,240,000**



**List Number:** 15058825
**Area:** Southwestern Michigan - S
**Municipality:** Hagar Twp
**Lot Dimensions:** Irregular
**Body of Water:** Lake Michigan
**Cross Streets:** Pier Road
**Waterfront Y/N:** Yes
**Water Access Y/N:** Yes
**Directions:** Take M-63 north out of St. Joe roughly 7 miles to west on Pier Road, then 3rd drive on the west side.

**Property Sub-Type:** Acreage
**Sub-Area:** S40 - Coloma School
**County:** Berrien
**Water Frontage:** 320
**Possession:** Immediate

**Status:** Active
**List Price:** 3,240,000
**List Price/Acre:** 203,773.58
**Tax ID #:** 111011400001031
**Lot Acres:** 15.9
**Lot Square Footage:** 692,604
**Road Frontage:** 450

---

**Legal:** To follow
**Taxable Value:** 523,600
**Annual Property Tax:** 23,341
**School District:** Coloma

**SEV:** 523,600
**Tax Year:** 2015
**Zoning:**

**For Tax Year:** 2015
**Homestead %:** 0
**Special Assmt/Type:** None known

**High School:**
**Middle School:**
**Elementary School:**

---

**Assoc. Amenities:**
**Assoc. Fee Incl.:**
**Auction Details:**
**Docs at List Office:** Aerial Photo; Plat Map; Survey

**Lot Description:** Wooded
**Mineral Rights:** Unknown
**Outbuildings:**
**Sale Conditions:** None
**Street Type:** Paved; Public

**Terms Available:** Cash/Conventional
**Util Avail at Street:** Cable; Electric; Natural Gas
**Utilities Attached:** Electric; Natural Gas
**Water Fea.:** All Sports; Deeded Access; Private Frontage; Shared
**Amenities:** Frontage; View
**Water Type:** Lake

---

**Marketing Remarks:** 15 1/2 acres on Lake Michigan!! Its a once in a lifetime opportunity to own your own resort size piece of Lake Michigan frontage, which was once called Pottowattami Resort, and has now been cleared of most all of the small cottages and buildings (other than 2 condo bldgs) & is ready for a beautiful new life, whether its for large single family home sites, your own private paradise, or use the pre-approved condo unit state & health dept, approval & build your own community! Its situated right on Lake Michigan, 7 miles north of St. Joe & equally from South Haven, with its own bricked/lighted boardwalk to the private sandy beach below! The property includes nearly 400 feet of private beach and is super easy to drive your golf cart to the waters edge!! Store your water toys right on the beach

**Exclusive Agency:** No                                                    **RP:** No

---



**Presented by**
Jackson G Matson
@properties Harbor Country
289-214-0240
jackson@atproperties.com
http://michiganluxurylakehomes.com

---

All information deemed materially reliable but not guaranteed. Interested parties are encouraged to verify all information. Copyright 2016 MichRIC, LLC All rights reserved. The property on this sheet has been made available on 05/05/2016 3:07 PM and may not be listed by the office/agent presenting this information.

History for MLS # 15058825      4766 ARBOR Avenue, Coloma, MI 49038                    $3,240,000

| + | MLS # | Status | Price | % Change | Date | DOM | CDOM | Address |
|---|-------|--------|-------|----------|------|-----|------|---------|
| - | 15058825 | Active | $3,240,000 | 802.5% | 11/09/2015 | 179 | 179 | 4766 ARBOR Avenue |
| | " | Price Change | $3,240,000 | -0.6% | 02/25/2016 | 109 | | |

Change by: Christopher S Siriano

Change at 4:42 PM Eastern: changed *List Price*
Old Value: 3260000.00
New Value: 3240000.00

| | | Price Change | $3,260,000 | -0.6% | 02/07/2016 | 91 | | |

Change by: Christopher S Siriano

Change at 4:27 PM Eastern: changed *List Price*
Old Value: 3280000.00
New Value: 3260000.00

| | | Price Change | $3,280,000 | -3.5% | 01/28/2016 | 81 | | |

Change by: Christopher S Siriano

Change at 10:23 AM Eastern: changed *List Price*
Old Value: 3400000.00
New Value: 3280000.00

| | | Price Change | $3,400,000 | -20.9% | 01/25/2016 | 78 | | |

Change by: Christopher S Siriano

Change at 5:02 PM Eastern: changed *List Price*
Old Value: 4300000.00
New Value: 3400000.00

| | | Price Change | $4,300,000 | -1.8% | 01/18/2016 | 71 | | |

Change by: Christopher S Siriano

Change at 11:39 AM Eastern: changed *List Price*
Old Value: 4380000.00
New Value: 4300000.00

| | | Price Change | $4,380,000 | -2.2% | 01/11/2016 | 64 | | |

Change by: Christopher S Siriano

Change at 2:10 PM Eastern: changed *List Price*
Old Value: 4480000.00
New Value: 4380000.00

| | | Price Change | $4,480,000 | -23.8% | 01/08/2016 | 61 | | |

Change by: Christopher S Siriano

Change at 11:07 AM Eastern: changed *List Price*
Old Value: 5880000.00
New Value: 4480000.00

| - | Price Change | $5,880,000 | -6.7% | 12/28/2015 | 50 |

Change by: Christopher S Siriano

Change at 1:16 PM Eastern: changed *List Price*
Old Value: 6300000.00
New Value: 5880000.00

| - | Text, etc. | $6,300,000 | | 11/10/2015 | 2 |

Change by: Christopher S Siriano

Change at 3:45 PM Eastern: changed *Marketing Remarks*
Old Value: 15 1/2 acres on Lake Michigan
New Value: 15 1/2 acres on Lake Michigan!

| - | New | $6,300,000 | | 11/09/2015 | 1 |

Change by: Christopher S Siriano

Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: PottAAAA
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: pott7
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pott5
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pott1
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pott3
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: pott6
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pott4
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pott2
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pottowattami4
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pottowattami3
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pottowattami5
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pottowattami2
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: pottawattamiAA
Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: Pottowattami3

Change at 3:18 PM Eastern: changed *From #15058672*
Old Value:
New Value: PottawattamiBB
Change at 3:18 PM Eastern: Added new listing

| - | Text | $6,300,000 | | 11/09/2015 | 1 | |

Change by: Christopher S Siriano

Change at 3:18 PM Eastern: Copied listing from 15058672

| - 14049347 | Expired | $359,000 | -4.3% | 02/21/2015 | 180 | 180 4766 Arbor Avenue |
| - | Status | $359,000 | | 02/22/2015 | 181 | |

Change by: MichRIC

Change at 1:00 AM Eastern: changed *Status*
Old Value: Active
New Value: Expired

| - | Price Change | $359,000 | -7.7% | 12/05/2014 | 102 | |

Change by: Pat Snow

Change at 12:03 PM Eastern: changed *List Price*
Old Value: 389000.00
New Value: 359000.00

| - | Price Change | $389,000 | -2.5% | 12/03/2014 | 100 | |

Change by: Pat Snow

Change at 3:14 PM Eastern: changed *List Price*
Old Value: 399000.00
New Value: 389000.00

| - | Price Change | $399,000 | -6.1% | 09/29/2014 | 35 | |

Change by: Pat Snow

Change at 1:21 PM Eastern: changed *List Price*
Old Value: 425000.00
New Value: 399000.00

| - | Text, etc. | $425,000 | | 09/29/2014 | 35 | |

Change by: Pat Snow

Change at 1:11 PM Eastern: changed *Road Frontage*
Old Value:
New Value: 0.00
Change at 1:11 PM Eastern: changed *Auction or For Sale*
Old Value:
New Value: S
Change at 1:11 PM Eastern: changed *Sub Agency ($/%)*
Old Value: 3
New Value: 3%
Change at 1:11 PM Eastern: changed *Buyer Agency ($/%)*
Old Value: 3
New Value: 3%
Change at 1:11 PM Eastern: changed *Trans Coord ($/%)*
Old Value: 2

New Value: 2%
Change at 1:11 PM Eastern: changed *Fireplace*
    Old Value: N
    New Value: Y
Change at 1:11 PM Eastern: changed *Total Fireplaces*
    Old Value:
    New Value: 1.00
Change at 1:11 PM Eastern: changed *Half Baths*
    Old Value:
    New Value: 0.00
Change at 1:11 PM Eastern: changed *Main Level Master*
    Old Value:
    New Value: Y
Change at 1:11 PM Eastern: changed *Main Level Laundry*
    Old Value:
    New Value: N
Change at 1:11 PM Eastern: changed *Stories (old)*
    Old Value: 3
    New Value: 2

| | Price Change | $425,000 | -5.6% | 09/04/2014 | 10 | |
|---|---|---|---|---|---|---|

Change by: Pat Snow

Change at 2:57 PM Eastern: changed *List Price*
    Old Value: 450000.00
    New Value: 425000.00

| | New | $450,000 | | 08/26/2014 | 1 | |
|---|---|---|---|---|---|---|

Change by: Pat Snow

Change at 10:34 AM Eastern: Added new listing

| - 13036981 | Expired | $375,000 | -10.5% | 12/24/2013 | 183 | 183 4766 #9 Arbor Avenue |
|---|---|---|---|---|---|---|
| - | Status | $375,000 | | 12/25/2013 | 184 | |

Change by: MichRIC

Change at 12:59 AM Eastern: changed *Status*
    Old Value: Active
    New Value: Expired

| | New | $375,000 | | 06/24/2013 | 0 | |
|---|---|---|---|---|---|---|

Change by: Carrie Burkhardt

Change at 11:30 AM Eastern: Added new listing

| - 12037657 | Expired | $419,000 | 6.1% | 12/31/2012 | 177 | 177 4766 Arbor Avenue |
|---|---|---|---|---|---|---|
| - | Status | $419,000 | | 01/01/2013 | 178 | |

Change by: MichRIC

Change at 12:59 AM Eastern: changed *Status*
    Old Value: Active
    New Value: Expired

| | New | $419,000 | | 07/07/2012 | 1 | |
|---|---|---|---|---|---|---|

Change by: Paul Hicks

Change at 7:54 PM Eastern: Added new listing

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| - 12034231 | Expired | $395,000 | 21.5% | 12/13/2012 | 160 | 160 | 4766 Arbor Avenue |
| - | Status | $395,000 | | 12/14/2012 | 161 | | |

Change by: MichRIC

Change at 12:59 AM Eastern: changed *Status*
Old Value: Active
New Value: Expired

| | | | | | | |
|---|---|---|---|---|---|---|
| ¨ | Price Change | $395,000 | -5.7% | 10/23/2012 | 110 | |

Change by: Paul Hicks

Change at 10:13 PM Eastern: changed *List Price*
Old Value: 419000.00
New Value: 395000.00

| | | | | | | |
|---|---|---|---|---|---|---|
| ¨ | New | $419,000 | | 07/06/2012 | 0 | |

Change by: Rebecca Shaner

Change at 4:04 PM Eastern: Added new listing

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| - 2628235 | Expired | $325,000 | -92.3% | 01/01/2007 | 200 | 200 | 4766 Arbor Avenue |
| - | Status | $325,000 | | 01/01/2007 | 201 | | |

Change by: MichRIC

Change at 4:12 AM Eastern: changed *Status*
Old Value: Withdrawn
New Value: Expired

| | | | | | | |
|---|---|---|---|---|---|---|
| ¨ | Status | $325,000 | | 08/31/2006 | 78 | |

Change by: Christopher S Siriano

Change at 9:41 AM Eastern: changed *Status*
Old Value: Active
New Value: Withdrawn

| | | | | | | |
|---|---|---|---|---|---|---|
| - | New | $325,000 | | 06/15/2006 | 1 | |

Change by: Christopher S Siriano

Change at 12:13 AM Eastern: Added new listing

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| - 2419023 | Sold | $4,200,000 | 84.6% | 04/20/2006 | 29 | 29 | 4766 Arbor Avenue |
| ¨ | Status | $4,200,000 | | 04/20/2006 | 707 | | |

Change by: Christopher S Siriano

Change at 7:42 PM Eastern: changed *Status*
Old Value: Pending
New Value: Closed

| | | | | | | |
|---|---|---|---|---|---|---|
| - | Sold Price | $4,200,000 | | 04/20/2006 | 707 | |

Change by: Christopher S Siriano

Change at 7:42 PM Eastern: changed *Sold Price*
Old Value:
New Value: 4200000.00

- Price Change       $4,200,000       23.5%      02/24/2006       651

Change by: Christopher S Siriano

Change at 12:02 PM Eastern: changed *List Price*
Old Value: 3400000.00
New Value: 4200000.00

- Price Change       $3,400,000       3.0%       06/22/2004       40

Change by: Christopher S Siriano

Change at 10:45 PM Eastern: changed *List Price*
Old Value: 3300000.00
New Value: 3400000.00

- Status              $3,300,000                  06/13/2004       31

Change by: Christopher S Siriano

Change at 9:08 PM Eastern: changed *Status*
Old Value: Active
New Value: Pending

- Status              $3,300,000                  06/13/2004       31

Change by: Christopher S Siriano

Change at 9:08 PM Eastern: changed *Selling Member*
Old Value:
New Value: Christopher S Siriano
Change at 9:08 PM Eastern: changed *Status*
Old Value: Active Backup
New Value: Active

- New                 $3,300,000                  05/14/2004       0

Change by: Christopher S Siriano

Change at 3:05 PM Eastern: changed *Status*
Old Value: Active
New Value: Active Backup
Change at 3:04 PM Eastern: Added new listing

- 2260632   Sold      $2,275,000                  02/06/2003       7       7 4766 Arbor Avenue
-           Status    $2,400,000                  02/06/2003       63

Change by: Katie Imach

Change at 12:16 PM Eastern: changed *Status*
Old Value: Pending
New Value: Closed

- Sold Price          $2,400,000                  02/06/2003       63

Change by: Katie Imach

Change at 12:16 PM Eastern: changed *Sold Price*

Old Value:
New Value: 2275000.00

| Status | $2,400,000 | 12/14/2002 | 9 |

Change by: Christopher S Siriano

Change at 2:58 PM Eastern: changed *Status*
Old Value: Active
New Value: Pending

| New | $2,400,000 | 12/14/2002 | 9 |

Change by: Christopher S Siriano

Change at 2:58 PM Eastern: changed *Selling Member*
Old Value:
New Value: Christopher S Siriano
Change at 2:54 PM Eastern: Added new listing

**REQUIRED STATEMENT**
**TO ACCOMPANY MOTIONS FOR RELIEF FROM STAY**

All Cases: Debtor(s) __Lake Michigan Beach Pottawattamie Resort__  Case No. __15-42427__  Chapter __11__

All Cases: Moving Creditor _____ BCL-Bridge Funding LLC _____  Date Case Filed __12/16/2015__

Nature of Relief Sought: ☑ Lift Stay    ☐ Annul Stay    ☐ Other (describe) _____

Chapter 13:  Date of Confirmation Hearing _____ or Date Plan Confirmed _____

Chapter 7: ☐ No-Asset Report Filed on _____
            ☐ No-Asset Report not Filed, Date of Creditors Meeting _____

1.    Collateral
      a.      ☐ Home
      b.      ☐ Car  Year, Make, and Model _____
      c.      ☑ Other (describe)_____ Real Estate _____

2.    Balance Owed as of Petition Date  $ ____ $2,905,817.60 ____
      Total of all other Liens against Collateral $ ____ $123,000 ____

3.    In chapter 13 cases, if a post-petition default is asserted in the motion, attach a payment history listing the
      amounts and dates of all payments received from the debtor(s) post-petition.

4.    Estimated Value of Collateral (must be supplied in *all* cases)  $ _____ 3,2000,000 _____

5.    Default
      a.      ☑ Pre-Petition Default
              Number of months _____        Amount $ _____

      b.      ☐ Post-Petition Default
              i.      ☐ On direct payments to the moving creditor
                      Number of months _____        Amount $ _____
              ii.     ☐ On payments to the Standing Chapter 13 Trustee
                      Number of months _____        Amount $ _____

6.    Other Allegations
      a.      ☑ Lack of Adequate Protection § 362(d)(1)
              i.      ☐ No insurance
              ii.     ☐ Taxes unpaid        Amount $ _____
              iii.    ☐ Rapidly depreciating asset
              iv.     ☐ Other (describe) _____

      b.      ☑ No Equity and not Necessary for an Effective Reorganization § 362(d)(2)

      c.      ☐ Other "Cause" § 362(d)(1)
              i.      ☐ Bad Faith (describe)_____
              ii.     ☐ Multiple Filings
              iii.    ☐ Other (describe) _____

      d.      Debtor's Statement of Intention regarding the Collateral
              i. ☐ Reaffirm   ii ☐ Redeem   iii. ☐ Surrender   iv. ☐ No Statement of Intention Filed

Date: _____ 5/9/2016 _____          _____ Marc Fenton _____
                                                          Counsel for Movant

(Rev. 12 /21/09)